IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LATEX CONSTRUCTION     :
COMPANY,     :
     :
    Plaintiff,     :
     :    CIVIL ACTION NO.
v.     :    1:12-CV-892-RWS
     :
EVEREST NATIONAL     :
INSURANCE COMPANY,     :
     :
    Defendant.     :

## ORDER

This case is before the Court on Everest's Motions for Summary

Judgment ([54], [70])[1] and Latex's Motion for Partial Summary Judgment [74].

After reviewing the record, the Court enters the following Order.

### Background

*The Everest Policy*

Latex Construction Company has been in the business of welding and

laying pipes for over sixty years.  According to its 2009 insurance renewal

application, in 2007, Latex had revenues of $272,464,000.  Latex procures

---

[1] It appears that Everest's motions for summary judgment are the same, except that the earlier motion [54] was redacted and the later motion [70] was unredacted and filed under seal.

AO 72A
(Rev.8/82)

various lines of insurance for its business, including: general liability, excess general liability, workers compensation, automobile, pollution, and others. Willis Insurance Services of Georgia, Inc. ("Willis") is the insurance broker of record for Latex.  Everest issued Policy No. 71G7000031-071, an excess general liability policy, to Latex for the period of January 1, 2007, to January 1, 2008 ("Everest Policy" or "Policy").[2]  Zurich American Insurance Company ("Zurich") provided Latex's underlying general liability insurance for the same policy period ("Zurich Policy").  The Zurich Policy has a one million dollar per-occurrence limit of liability.

The Everest Policy applies to "injury or damage covered by the 'first underlying insurance'" and obligates Everest to "pay on behalf of any insured those sums in excess of 'underlying insurance' or 'other insurance' that any insured becomes legally obligated to pay as damages to which this insurance applies."  (Everest Policy, [70-2] I.A.1., I.A.2.)  The Policy further obligates Everest to "defend any 'suit' against any insured seeking damages to which this insurance applies when 'underlying insurance' or 'other insurance' . . . [c]ease

---

[2] Unless otherwise noted, the facts are taken from the Parties' respective statements of material fact ([70-26], [74-2]) and are not disputed.

2

to apply because of exhaustion of their limits of insurance solely by the payment of claims, settlements, judgments or 'defense expenses' for an 'occurrence' to which this insurance also applies."  (Everest Policy, [70-2] VI.A.3.b.)

The Everest Policy's notice provisions read:

> **Duties in the Event of 'Occurrence', Claim or 'Suit'**
>
> a.   In the event of an 'occurrence', claim, or 'suit' or 'loss', we or our representative must receive prompt notice of the 'occurrence' or 'loss'. . . .
>
> b.   If a claim is made or a 'suit' is brought against any insured you must: . . .
> (2)   Notify us as soon as practicable.

(Everest Policy [70-2] IV.3.a. (*as amended and replaced by Georgia Changes*, p. 32 of 38), IV.3.b.2.)  The Zurich Policy contains similar notice provisions. The Everest Policy also provides: "No person or organization has a right under this Coverage Part . . . to sue us on this Coverage Part unless all of its terms have been fully complied with."  (Everest Policy [70-2] IV.4.b.)

Along with the Policy, Everest provided Latex with Claim Reporting

Guidelines ("Guidelines").  The Guidelines specify that they are "merely for

illustrative purposes" and are not "intended to replace, modify or waive any

terms, conditions or warranties contained in the policy."  (Guidelines [70-2] at 4

of 38.)  The first page of the Guidelines provides contact information for

sending excess liability loss notices to Everest.  The Guidelines also address

when the insured should report a claim to Everest.  (Guidelines [70-2] at 5-6 of

38.)

<em>The Panhandle Lawsuit</em>

Latex was hired to work on Panhandle Eastern Pipe Line Company's

("Panhandle") Tuscolusa East End Enhancement Project ("Project").  Latex's

responsibilities on the Project included welding the pipeline, hydrostatic testing

the pipeline and getting it ready to be placed into service, and burying pipe.  On

October 23, 2007, a pipe section failed hydrostatic testing.  During the test, the

pipe ruptured near a weld.  Three days later, after the pipe section was put back

together, it failed another hydrostatic test, this time within an inch or so of a

different weld.  Dave Stotz, then-Vice President at Latex, testified that he

believed he heard about the test failures immediately and recalled telling

4

Latex's President Bill Honey about the failures "on or about the time that the hydrostatic failures occurred."

By November 2007, Panhandle communicated to Latex that it was "concerned" that the Project's x-ray company (Acuren) had, for a variety of reasons, missed flaws in the welds and that some of the welds that had been accepted were no longer acceptable.  Panhandle hired a third party to review the welds and audit the x-ray film.  Ultimately, Panhandle had concerns about 200 to 300 welds.  According to Stotz, as a result of the two pipe failures in October 2007, Panhandle shut the whole job down and spent millions of dollars investigating the remainder of the welds.  (Stotz Depo. [70-1] at 20 of 47:4-12.)

On December 1, 2007, after reviewing lab reports and weld cross-sections related to the October 2007 test failures, National Welding sent a one-page letter to Latex.  The letter indicated that the electrode specified by the welding procedures (established by Panhandle) for the Project was "asking for a cracking problem."  By the end of 2007, Latex acknowledged that there was a high repair rate on the welds, but the rate was not inconsistent with repair rates on other jobs.  In a November 2007 meeting, a Panhandle project manager mentioned to Stotz that Panhandle may hold Latex accountable for some of the

5

costs associated with the test failures.  However, Stotz testified, "everybody else

indicated that it wasn't anything that Latex had done wrong," and other than the

project manager's comment, "[Latex] didn't think it was any issue."

During a conference call on January 4, 2008, between Stotz and

Panhandle representatives Dave Owen and Dan Pribble, Latex attempted to find

ways to "appease" Everest so that they could continue their business

relationship.  (Stotz Depo. [70-1] at 32 of 47: 16-23.)  On January 21, 2008,

Pribble sent Bill Honey a proposed Agreement Letter "regarding [the]

conversation on 1/4/08 . . . concerning the settlement meeting for the repairs for

our East End Pipeline."  (Proposed Agreement Letter [70-6] at 2 of 9.)

According to the letter, it "captured the essence" of the January 4 conference.

The letter reads, in pertinent part:

> [T]he Parties acknowledged that the Project pipeline
> requires significant remedial evaluation and repair
> work before it can be placed into service.  A
> comprehensive, independent review of the x-ray film
> has indicated many welds need to be cut out or
> repaired. . . .  Latex will provide, at its sole cost and
> without any remuneration under the Construction
> Agreement, construction labor and equipment in
> support of repair and replacement of the defective
> welds above and below ground. . . .  Latex will be
> responsible for the cost of repairs resulting from

6

> substandard installation practices and failure to
> comply with engineering and construction standards
> and specifications incorporated into the Construction
> Agreement. . . .
>
> In addition, the Parties agree to continue discussion
> with Acuren focusing on the financial impact as a
> result of Acuren's failure to timely detect the original
> weld anomalies. . . . .
>
> So long as Latex faithfully performs its obligations as
> set forth above and is not in breach of any such
> obligations, Panhandle agrees that it will refrain from
> pursuing any legal action against Latex with respect to
> any matters that are subject to this Agreement.

(Proposed Agreement Letter [70-6] at 3-4 of 9.)

Latex refused to sign the proposed agreement and responded to Everest in

writing on January 23, 2008.  The response letter, authored by Stotz, stated:

> The alleged misrepresentation of the x-rays by
> Panhandle's subcontractor was the cause of this
> current issue. . . .
>
> I did not agree that Latex performed substandard
> practices and failed to comply with engineering and
> construction standards and specifications.  However,
> we agreed that the repair rate was excessive, due to
> lack of qualified welders available at the time of
> construction. . . .

7

> Our offer was a good faith offer in the spirit of our
> Alliance Agreement and meant to help off-set some of
> the direct costs to repair these welds. . . .
>
> In conclusion, we can't in good faith accept the
> liability inferred in your proposal. . . . . We do agree
> with your analysis of your [x-ray] subcontractor's
> responsibility, but do not feel comfortable with their
> desire or ability to contribute to the financial
> resolution of this situation.  I am still committed to
> offer Latex's financial resources to off-set some of the
> costs incurred by Panhandle from this unfortunate
> issue, but have an obligation to protect Latex from
> undefined liability.

(Latex Response Letter [70-7] at 3-4 of 4.)  As of January 2008, Latex had not

informed any of its insurers of a potential claim relating to the Project.

By April 2008, Stotz heard a rumor that Panhandle was considering a

lawsuit on the Project.  (Stotz Depo. [70-1] at 38 of 47: 3-19.)  In a letter dated

May 30, 2008, Everest informed Latex and five other parties that a lawsuit had

been filed against them on April 3, 2008 "to recover the damages it suffered as

a result of the problems arising on the East End Project" ("Panhandle Suit").

(Panhandle Litigation Letter [70-9] at 3 of 3.)  According to the letter, the

estimated cost overruns on the Project were over $50 million.  However, the

letter continued, Everest had not attempted to serve any of the named parties

8

because "it would prefer to resolve this matter informally before proceeding with litigation." (Panhandle Litigation Letter [70-9] at 3 of 3.) Everest invited the parties to a meeting to try to settle the dispute. The letter stated: "In light of the magnitude of the costs involved, it is recommended you place your insurers on notice if you have not already done so." (Panhandle Litigation Letter [70-9] at 3 of 3.)

*Notice to Insurers of Panhandle Suit*

According to Timothy Elder, Secretary-Treasurer of Latex, Latex does not have any internal guidelines of which he is aware for handling insurance claims. (Elder Depo. [70-5] at 20 of 32: 19-21.) Latex's practice, in cases involving litigation, was to make Willis aware of the claim and rely on Willis to provide notice to insurers when instructed to do so. (Elder Depo. [70-5] at 16 of 32: 10-17.) However, the Service Agreement between Latex and Willis did not expressly delegate to Willis the duty to communicate Latex's claims to its carriers.

Elder testified that Latex's practice was to report "situations[s] which could perhaps or should lead to an insurance response." (Elder Depo. [70-5] at 19 of 32: 4-7.) According to Elder, Latex determined it was appropriate to

notify their carriers about the Panhandle Suit in late May or early June 2008.
(Elder Depo. [70-5] at 19 of 32: 14-21.)  On June 3, 2008, without necessarily
believing Latex had an obligation to do so under its insurance policies, Elder
emailed Willis about the Panhandle Litigation Letter of May 30, 2008, and
asked Willis to "please ensure that the appropriate parties are notified in order
to assist us in protecting our interests."  (Elder Depo. [70-5] at 23 of 32: 11-23;
Notice to Willis [70-12] at 2 of 2.)  The email did not specify which carriers
should be notified for which policy years, but Latex believed that its request
included notification to Everest for the 2007-2008 Policy.  On June 6, 2008,
Willis notified Zurich of the Panhandle Suit.  Three days later, Willis notified
AIG, Latex's excess carrier for 2008 to 2009, of the suit.

On August 18, 2008, Panhandle called a meeting of all of the parties to
attempt to settle the case.  (Stotz Depo. [70-1] at 30 of 47: 2-4; 08/28/08 Letter,
Latex to Willis [70-15] at 2 of 3.)  According to Stotz, Latex did not believe at
that point that Panhandle was blaming Latex for problems with the Project, and
thought perhaps Panhandle would ask them to join a suit against Acuren.  (Stotz
Depo. [70-1] at 30 of 47: 5-14.)  However, in an effort to maintain a business
relationship with Panhandle and to "help offset some of the profit that [Latex

was] going to make on the project," Latex offered Panhandle three or four million dollars.  (Stotz Depo. [70-1] at 31 of 47: 3-15.)  Panhandle rejected Latex's offer.  On August 28, 2008, Elder informed Willis of the August 18 settlement meeting.  Elder told Willis that Panhandle was claiming $44 million in damages and asked Willis to "forward this letter and its attachments to Latex's CGL and umbrella insurers for 2007 and 2008 and ask them to confirm coverage and defend Latex in this matter."  (08/28/08 Letter, Latex to Willis [70-15] at 2-3 of 3.)

On February 3, 2009, at the request of Zurich and AIG, Latex's counsel asked Willis to provide copies of all notice letters sent to Latex's carriers regarding the Panhandle Suit.  (02/03/09 Kilpatrick Email [70-13] at 2 of 9.)  At that point, Latex had not received any correspondence from Everest regarding the litigation.  Shortly thereafter, on February 5, 2009, Willis emailed CRC Insurance Services, Everest's agent, official notice of the Panhandle Suit. (Notice to Everest [70-16] at 2 of 3.)

*Subsequent Coverage Actions*

Via letter dated January 30, 2009, Zurich agreed to participate in Latex's defense in the Panhandle Suit subject to "a full reservation of rights," including

11

the right to bring a declaratory judgment action against Latex to determine Zurich's duties to Latex under its 2008-2009 policy.  (01/30/09 Zurich Letter [70-17] at 5-9 of 9.)  Zurich later supplemented its January 30 letter to advise Latex that "this loss potentially should be established under [the 2007-2008] policy."  (04/08/09 Zurich Letter [70-18] at 4 of 6.)

In correspondence dated June 11, 2009, Everest informed Latex that it had received a copy of the Panhandle Complaint and "it [was Everest's] position that there may not be coverage for this lawsuit under the Everest policy." (Everest Reservation of Rights Letter [70-19] at 2-3 of 7.)  The Everest letter continued:

> Please be advised that Everest reserves the right to raise and rely upon any of the coverage issues raised by Zurich in its April 8, 2009 letter.  Everest further reserves its rights to raise and rely upon any coverage issues subsequently raised by Zurich and to rely on any coverage issues it raises independently of Zurich.
>
> . . .
>
> As stated in the insuring agreement, the Everest policy does not apply to any claim or suit that the first underlying carrier does not pay for any reason other than exhaustion of their limits.  Zurich has reserved its

12

rights under it[s] 1/1/07 to 1/1/08[3] policy and it is therefore unclear at this time if there is coverage for this matter under the underlying Zurich policy. . . .

. . .

In light of the allegations contained in the Panhandle complaint, the coverage position set forth in the Zurich letter of April 8, 2009 and the language of the Everest policy, Everest reserves its right in connection with this matter.

We continue to reserve all of Everest's rights[,] remedies and defenses under the Everest Policy as well as under the 'Underlying Insurance' as defined in the Everest policy.  By specifying in this letter the grounds for Everest's reservation of rights Everest does not intend to and does not waive any other term, condition, provision or exclusion of its policy or the 'Underlying Insurance'.  Everest expressly incorporates all such other terms, conditions, provisions and exclusions as set forth at length herein.

The letter contained no reference to the Everest Policy's notice provisions, but did contain excerpts from several other Policy provisions.

On September 17, 2010, Zurich filed suit against Latex seeking a declaration that Zurich had no duty to defend or indemnify Latex in the

---

[3] This date range appears to be a mistake in the letter: earlier in the same document, Everest discusses Zurich's reservation of rights under its 2008-2009 policy, which led Everest to question whether its excess policy for 2007-2008 even applied.

13

Panhandle Suit ("Zurich Suit").  Zurich alleged, among other things, that it had

no duty to defend or indemnify Latex because Latex failed to "promptly" notify

Zurich of an "occurrence" which may give rise to a claim.  (Original Zurich

Complaint [70-21] at 21-22 of 24.)  Zurich later amended its complaint to

withdraw allegations regarding its duty to indemnify.  By May 13, 2011, at the

latest, Everest was aware of the Zurich Suit and that Zurich and Latex were in

settlement negotiations.  (05/03/11 Kilpatrick Settlement Email [70-23] at 3 of

4.)

Everest also learned on May 13, 2011, that Panhandle had offered to

settle its claims against Latex.  Everest was asked on that date by Latex's

counsel to contribute to the Panhandle settlement in the amount in excess of the

Zurich Policy limits.  (05/03/11 Kilpatrick Settlement Email [70-23] at 3 of 4.)

That same day, Everest sent a coverage position letter, explicitly amending its

June 11, 2009 reservation of rights letter, informing Latex that Everest had

"concluded that coverage does not exist under the Everest Policy" and denying

Latex's request for coverage.  (Everest Denial Letter [70-24] at 4 of 8.)

Specifically, Everest's denial letter stated:

14

The Everest policy follows form to the Zurich policy.
Based on the allegations, Everest questions whether
an 'occurrence' is stated under the terms of the Zurich
policy.  Even if an 'occurrence' is stated, the
contractual liability exclusion, b., may apply to bar
coverage.  Finally, irrespective of the 'occurrence'
issue and the application of exclusion b., the
allegations and material provided indicate that
Panhandle seeks actual damages for the repair and
replacement of Latex's product or work.  Coverage
for these damages is barred by exclusions j(5), j(6), k,
and l.  And, because no covered 'property damage'
exists, the Everest policy does not afford coverage for
Panhandle's alleged consequential damages.

Even if coverage was potentially afforded under the
Everest policy, Everest has no indemnity obligation
until all underlying coverage through Zurich has
exhausted.  This has not occurred and no indemnity
obligation exists.  As such, Everest takes no position
in regard to your settlement proposal as outlined in
your e-mail of May 13, 2011.

. . .

If any additional information affecting coverage is
provided, we reserve the right to withdraw or modify
our coverage position.  Everest also reserves the right
to institute a declaratory judgment action and seek a
judicial determination of the coverage issues . . . .

Following Everest's denial letter, on March 15, 2012, Latex filed this

action for breach of contract and a judicial declaration of Everest's obligations

15

with respect to the Panhandle Suit.  (Compl. [1].)  Everest has moved for

summary judgment on grounds that coverage is barred because "Latex's notice

to Everest of the underlying insurance claim forming the basis of this litigation

is untimely as a matter of law."  (See generally Everest Motion for Summary

Judgment Brief ("Def.'s MSJ Br.") [70-25].)  Latex moves for partial summary

judgment on grounds that Everest did not properly reserve the right to raise a

timeliness of notice defense and Everest waived the right to raise such a

defense.  (See generally Latex Motion for Partial Summary Judgment Brief

("Pl.'s MPSJ Br.") [74-1].)

## Discussion

## I.     Legal Standard - Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  "The moving

party bears 'the initial responsibility of informing the . . . court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any,

which it believes demonstrate the absence of a genuine issue of material fact.'"

16

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004)

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the

moving party makes such a showing, the burden shifts to the non-movant, who

must go beyond the pleadings and present affirmative evidence to show that a

genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at

248.  A fact is not material if a dispute over that fact will not affect the outcome

of the suit under the governing law.  Id.  An issue is genuine when the evidence

is such that a reasonable jury could return a verdict for the non-moving party.

Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must

view all evidence and draw all reasonable inferences in the light most favorable

to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296

(11th Cir. 2002).  But, the court is bound only to draw those inferences which

are reasonable.  "Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no genuine issue for trial."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II.   Analysis

Latex maintains that the Court need not address timeliness of Latex's notice because under Hoover v. Maxum Indem. Co., 730 S.E.2d 413 (Ga. 2012) ("Hoover II"), Everest is precluded from raising a defective notice defense. (See generally Pl.'s MPSJ Br., [74].)  The Court agrees with Latex that Hoover II controls this issue.

The material facts in Hoover are similar to those in the present case.  Mr. Hoover was injured on the job when he fell from a roof.  He filed a personal injury lawsuit against his employer and others.  When his complaint was forwarded to Maxum, the employer's general liability insurer, it disclaimed coverage.  730 S.E.2d at 415-16.  Maxum's coverage letter stated that it would not provide a defense or indemnification and cited the policy's Employers

18

Liability Exclusion as grounds for its coverage position.  Id. at 415.  The

coverage letter also included broad language reserving Maxum's right to claim

other defenses, including that "coverage for this matter may be barred or limited

to the extent the insured has not complied with the notice provisions under the

policy."  Id. at 416.  The letter went on: "Maxum's specific enumeration of the

above policy defenses is not intended as a waiver of any other policy defenses

that Maxum may have that may arise from facts discovered in the future, nor

should Maxum be estopped from raising additional coverage defenses."  Id.

Subsequently, Maxum filed a declaratory judgment action against

Hoover's employer.  Maxum's complaint did not mention failure to comply

with the policy's notice provisions as a ground for denying coverage.  Instead,

Maxum again relied on the Employer's Liability Exclusion.  Id.  However,

Maxum did cite failure to comply with the policy's notice provisions as a

defense in a third-party suit filed by the employer, and in its answer to the

Hoover complaint.  Id.  But in its motion for summary judgment in the third-

party action, Maxum again asserted only policy exclusions as the basis for

denying coverage.  Id.

In <u>Hoover II</u>, the Georgia Supreme Court found that (1) Maxum could not deny the claim and reserve its right to assert other defenses later, and (2) even if Maxum were allowed to disclaim coverage and reserve its right to pursue other future defenses, Maxum's purported reservation of rights was defective. <u>Id.</u> at 416-18. Consequently, the court concluded that Maxum had waived its right to assert a defective notice defense and "Hoover was entitled to summary judgment on the issue of notice." <u>Id.</u> at 418. For the same reasons given by the Georgia Supreme Court in <u>Hoover II</u>, the Court finds that Everest is precluded from raising a defective notice defense and Latex is entitled to partial summary judgment on the issue of notice.

Like Maxum, Everest disclaimed coverage under the Policy. In its May 13, 2011 letter, Everest stated that it "reviewed the pleadings, its policy and the information provided concerning the claim and [] *concluded that coverage does not exist under the Everest policy*." (Everest Denial Letter [70-24] at 4 of 8 (emphasis added).) Accordingly, Everest wrote, "Everest must respectfully deny Latex's request for coverage." (<u>Id.</u>) Everest listed three grounds for its coverage position: (1) a question about whether an "occurrence" was stated

20

under the Zurich Policy, (2) the Policy's contractual liability exclusion, and (3) the Policy's property damage exclusions.  (Id. at 6-8.)

Like Maxum's letter denying coverage, Everest's denial letter also contains a broad reservation of rights.  It says: "If any additional information affecting coverage is provided, we reserve the right to withdraw or modify our coverage position. . . . Likewise, nothing in this letter is intended to or should be construed to deprive Latex of any rights it may have under the law or under the Everest Policy."  (Id. at 8 of 8.)  The denial letter explicitly "amends Everest's June 11, 2009 letter," which also includes broad reservation of rights language.  (Everest Reservation of Rights Letter [70-19] at 6 of 7 (". . . Everest reserves its right in connection with this matter.  We continue to reserve all of Everest's rights[,] remedies and defenses under the Everest policy as well as under the 'Underlying Insurance' as defined in the Everest policy.").)  The June 11, 2009 letter quotes several specific provisions from the Policy, including the Policy's definition of "occurrence" and provisions regarding coverage under the Zurich Policy.  (Id. at 4-6 of 7.)  Neither Everest letter mentions the Policy's notice provisions.

According to the Georgia Supreme Court, "[a]n insurer cannot both deny a claim outright and attempt to reserve the right to assert a different defense in the future." Hoover II, 730 S.E.2d at 416 (citing Browder v. Aetna Life Ins. Co., 190 S.E.2d 11 (Ga. Ct. App. 1972)).  The court reasoned:

> A reservation of rights is a term of art in insurance vernacular and is designed to allow an insurer to provide a defense to its insured while still preserving the option of litigating and ultimately denying coverage.  At a minimum, the reservation of rights must fairly inform the insured that, *notwithstanding [the insurer's] defense of the action*, it disclaims liability and does not waive the defenses available to it against the insured.

Id.  (internal quotations and citations omitted) (emphasis in original).  Thus, the court found, "Maxum failed to properly reserve its right to assert a notice defense when it denied [the employer's] claim on the grounds of the Employer Liability Exclusion and refused to undertake a defense." Id. at 417.  Here, Everest attempted just what Maxum attempted – to both deny coverage and reserve future defenses – which, after Hoover II, it not permitted.

The court in Hoover II went on to find that even if Maxum were permitted to deny coverage and reserve its rights to assert other defenses, Maxum's reservation was defective "because it did not unambiguously inform

22

[the employer] that Maxum intended to pursue a defense based on untimely notice of the claim." Id.  "A reservation of rights is not valid if it does not fairly inform the insured of the insurer's position." Id.  In Hooper II, even though *Maxum's denial letter specifically mentioned the insured's failure to provide timely notice* of the occurrence, the court found that the "boilerplate language" in the letter was not sufficient to put the employer on notice of Maxum's position.  Id. at 417-18.

In the present case, Everest never, prior to this litigation, mentioned a defense of untimely notice – not even in boilerplate language.  Indeed, when Everest moved to dismiss Latex's Complaint in this action, it did so on grounds that the Zurich Policy, and therefore the Everest Policy, "does not provide coverage for the damages purportedly caused by the acts or omissions alleged in the Panhandle Lawsuit."  (Def.'s MTD, [14-1] at 7 of 14.)  In its motion to dismiss, Everest argued: "Because certain exclusions apply to bar coverage, and the applicability of these exclusions are dispositive as a matter of law, no construction of Latex's factual allegations will support its causes of action." (Id.)  The motion goes on to discuss at some length the Policy's contractual liability exclusion and business risk exclusions.  (Id. at 9-12 of 14.)  Thus, even

after this action commenced in March 2012, Everest was disclaiming coverage under the Policy.  Everest mentioned defective notice as a defense for the first time in its Answer filed on November 20, 2012.

Under Hoover II, once Everest denied coverage, it no longer had a right to reserve future defenses.  Even if Everest were permitted to simultaneously deny and reserve (which the Court does not interpret Hoover II to allow), its reservation of rights was defective.  Everest's reservation provided even less notice (as to a notice defense) than the purported reservation of rights at issue in Hoover II.  Furthermore, in the early stages of this litigation, Everest maintained its position that it owed no duty to Latex because the claim at issue was not covered by the Policy.  Therefore, under Hooper II, Everest waived a defense based on late notice.

Everest's attempts to distinguish Hoover II from the present care are unavailing.  First, Everest argues that Hoover II "stands for the proposition that coverage defenses can be waived *in litigation*," which has not occurred here. (Def.'s MSJ Br. [70-25] at 28 of 39 (emphasis added).)  Everest contends that other courts interpreting Georgia law have not found coverage defenses are waived simply because those defenses were not listed in the denial letter.  The

first three cases cited by Everest for this point are Georgia Court of Appeals

decisions pre-dating <u>Hoover II</u>.  Additionally, Everest's authority is

distinguishable from this case and <u>Hoover II</u>.

   In <u>Lovett v. Am. Family Life Ins. Co.</u>, 131 S.E.2d 70, 73 (Ga. Ct. App.

1963), the plaintiff contended that "the defendant's first rejection of her claim,

on the ground that it was barred by the policy's nine months' waiting perior

[*sic*] for maternity benefits, estopped it from later asserting the defense of a pre-

existing condition."  Without any discussion whatsoever of any denials or

reservations of rights provided by the insurer to the plaintiff, the court in <u>Lovett</u>

concluded that the plaintiff's claim lacked merit because "[t]he doctrines of

implied waiver and estoppel, based upon conduct or action of the insurer, are

not available to bring within the coverage of a policy risks not covered by its

terms, or risks expressly excluded therefrom."  <u>Id.</u>  Here, Latex's motion for

partial summary judgment is not an attempt to bring within coverage a claim

that is not covered under the Policy's terms and exclusions.  Rather, Latex seeks

only to preclude Everest from asserting a defective notice defense (in theory,

allowing Everest to pursue other defenses based on the terms and exclusions of

AO 72A
(Rev.8/82)

the Policy).  Therefore, <u>Lovett</u> does not alter the Court's analysis of <u>Hooper II</u>

or <u>Hooper II</u>'s applicability to this matter.

Similarly, <u>St. Paul Fire & Marine Ins. Co. v. Purdy</u>, 199 S.E.2d 567, 568-

69 (Ga. Ct. App. 1973), contains no discussion of an insurer simultaneously

denying coverage and purportedly reserving future rights.  The court in <u>Purdy</u>

holds, without analysis or explanation:

> The defendant is not barred by waiver or estoppel
> from denying coverage on the ground of the
> expiration of the plaintiff's insurance by reason of
> nonpayment of the premium, by its previous reliance
> on the ground of the expiration of the insurance by
> reason of the contended termination of the plaintiff's
> employment, at the time of which previous reliance
> the plaintiff's cause of action or claim had already
> expired under the second defense.

<u>Id.</u>  The court goes on to hold – again without discussion of any background

facts – that the "defendant's initial representation that the plaintiff *was covered*,

does not estop it from later denying coverage."  <u>Id.</u> at 569 (emphasis added).

This case also does not persuade the Court to abandon its <u>Hooper II</u> analysis.

In <u>Kay-Lex Co. v. Essex Ins. Co.</u>, 649 S.E.2d 602, 605 (Ga. Ct. App.

2007), the court found that the primary insurer had not waived its right to assert

a defective notice defense just because it did not specifically identify that

26

defense in its reservation of rights letter.  However, <u>Kay-Lex</u> is distinguishable

from the present case in a very important respect: there, the primary insurer

agreed to defend the insured under a reservation of rights and the excess insurer

issued a reservation of rights; there is no indication that either insurer attempted

*both* to disclaim coverage and reserve its future rights.  An insurer's attempt to

simultaneously deny coverage and reserve its future rights is the central concern

in <u>Hoover II</u>.  According to the <u>Hoover II</u> court, simultaneous denial and

reservation, especially with a boilerplate reservation of rights, does not clearly

put the insured on notice of the insurer's position.  730 S.E.2d at 417.  The facts

in the present case are more akin to <u>Hoover</u> than <u>Kay-Lex</u>.

In <u>Lloyd's Syndicate No. 5820 d/b/a Cassidy Davis v. AGCO Corp.</u>, 734

S.E.2d 899, 906 (Ga. Ct. App. 2012), *rev'd on other grounds*, the court found

that insurers were not estopped from asserting other grounds to deny coverage

after they initially denied claims based on the policy's epidemic failure clause.

To support its conclusion, the court found: (1) that when warranty claims were

initially denied under a master insurance policy, the insurers took no position on

whether extended protection plans *also* provided a basis for denying the claims;

and (2) that the plaintiff did not show detrimental reliance on the insurers'

27

initial assertion that the epidemic failure clause in the master policy barred the claims.  Id. (emphasis added).  The Court agrees with Latex that this case does not change the Hoover II analysis.

Even though it came after Hoover II, AGCO Corp. does not mention the higher court's opinion.  It also contains no discussion of coverage denial letters (if there were any), or the insurers' coverage positions throughout the litigation (but suggests, based on the quoted language above, that the insurers did not initially take inconsistent positions on coverage).  Furthermore, the Court of Appeals focuses on detrimental reliance by the insured – an element of estoppel, not waiver, and an issue notably absent from the Hoover II case.  Again, this case does not demonstrate that the Court should not follow Hoover II.

Finally, Everest relies on Bank of Camilla v. St. Paul Mercury Ins. Co., 939 F. Supp. 2d 1299 (M.D. Ga. 2013), for the proposition that, at the very least, Hoover II is limited to the duty to defend and does not apply to the duty to indemnify.  (Def.'s MSJ Br., [70-25] at 30 of 39.)  In Bank of Camilla, the court did find Hoover II "inapposite."  Id. at 1305.  The court reached that conclusion because Georgia courts "have drawn a distinction between the duty to defend

28

and the duty to pay costs, finding that a refusal to defend does not affect the insurer's right to refuse payment of costs." Id.  The policy at issue in Bank of Camilla only provided for a duty to pay costs.  Id.  The Everest Policy, on the other hand, includes a duty to defend and a duty to indemnify.  (Everest Policy [70-2].)  Thus, the court's rationale in Bank of Camilla does not apply to the present case.

Further, as Latex notes, Hoover involved both the duty to defend and the duty to indemnify.  In his original complaint against Maxum, Hoover alleged that Maxum breached its duties to defend and indemnify his claim for compensation.  See Hoover v. Maxum Indem. Co., 712 S.E.2d 661, 662 (Ga. Ct. App. 2011).  Maxum disclaimed both duties and moved for summary judgment on grounds that timely notice of the occurrence had not been given and policy exclusions barred coverage.  Id. at 662-63.  Hoover filed a motion for partial summary judgment , contending that Maxum breached its duty to defend as a matter of law.  Id. at 663.

The trial court in Hoover found that Maxum had breached its duty to defend, but *did not breach its duty to indemnify because there was noncompliance with the policy's notice requirements*.  Id. (emphasis added).

29

The Court of Appeals affirmed in part and reversed in part, finding "that the evidence established an unreasonable failure to give timely notice as required by the policy, and therefore, Maxum was not obligated to provide *either a defense or coverage*." Id. (emphasis added). The Georgia Supreme Court granted certiorari in Hoover II to determine "whether the Court of Appeals properly analyzed the claim that Maxum waived its right to assert a defense based on untimely notice. . ." Id. Clearly, based on the case's history, that question relates to both Maxum's duty to indemnify and its duty to defend. Thus, the Court does not interpret Hoover II to be limited to an insurer's duty to defend.

Everest's second argument is that Hoover II is distinguishable from the present case because unlike Maxum, Everest initially reserved its rights and did not issue an immediate denial of coverage. (Def.'s MSJ Br. [70-25] at 28 of 39.) The Court finds this argument unpersuasive. When Everest *did* deny coverage, it also purported to reserve its rights to future defenses. In May 2011, Everest explicitly amended its earlier reservation of rights letter and denied

AO 72A
(Rev.8/82)

coverage outright.  The principles in <u>Hoover II</u> applied as soon as Everest

issued its denial letter amending its earlier position.[4]

     <u>Moon v. Cincinnati Ins. Co.</u>, 920 F. Supp. 2d 1301 (N.D. Ga. 2013)

directly supports this interpretation of <u>Hoover II</u>.  In <u>Moon</u>, the insurer initially

agreed to defend the suit, but later denied coverage on multiple, enumerated

grounds.  <u>Id.</u> at 1303-06.  The plaintiffs in <u>Moon</u> argued that, under <u>Hoover II</u>,

the insurer waived all coverage defenses other than those set forth in its denial

letter.  <u>Id.</u> at 1303.  The insurer responded that <u>Hoover II</u> did not apply to its

denial letter because the insurer *first* reserved its rights and agreed to defend,

and because it obtained non-waiver agreements with the plaintiffs, which

purported to reserve all rights the insurer had to deny liability or obligation to

the plaintiffs under the policy.  <u>Id.</u> at 1304-05.  Judge Thrash found, however,

---

[4] Even assuming the order of Everest's reservation of rights and denial letters make some impact on the analysis, the Court questions whether, under <u>Hoover II</u>, Everest's reservation of rights was sufficient to preserve its right to raise a deficient notice defense.  The June 2009 letter contains boilerplate language reserving all of Everest's rights under the law and the Policy, but it also identifies specific provisions within the Policy that led Everest to believe "there may not be coverage for [the Panhandle] lawsuit." (<u>See generally</u>, Reservation of Rights Letter, [70-19].)  Thus, while purporting to reserve all of its rights to future defenses, Everest gave indications as to which defenses it may pursue.  Further, unlike Maxum's letter in <u>Hoover II</u>, Everest's June 2009 and May 2011 letters do not even mention notice.  Therefore, it is difficult to see how Everest, in either of its letters, put Latex on clear notice of its defense position.

that when the insurer "subsequently denied coverage and refused to provide a defense . . . its denial letter fell within the purview of Hoover."  Id. at 1305. Under Hoover II, the court concluded, "the reservation of rights was extinguished when [the insurer] denied coverage" and the "letter denying coverage and revoking its defense should be construed as limiting the grounds [on which the insurer] can ultimately deny coverage."  Id. at 1305-06.[5]

Third, Everest contends that its "conduct does not evidence an intent to waive late notice as a defense to coverage."  (Def.'s MSJ Br. [70-25] at 28 of 39.)  To support this position, Everest points to: the fact that it reserved the right to rely on any defense raised by Zurich, its raising of an untimely notice defense in its Answer, and its "immediate" request to bifurcate discovery in order to pursue its late notice defense first in this litigation.  (Def.'s MSJ Br., [70-25] at 32 of 39.)  First, Hoover II says nothing about Everest's "intent" to waive a

---

[5] Under this interpretation of Hoover II, Everest's earlier reservation of rights, including its "right to raise and rely upon any of the coverage issues raised by Zurich in its [reservation of rights] letter," was extinguished by its denial letter.  Again, it is questionable whether this broad language was sufficient to put Latex on notice regarding an untimely notice defense. Regardless, Everest's purported reservation of Zurich's defenses (which did include deficient notice at some point *after* Everest's June 2009 letter), was extinguished when it "amended" its previous coverage position and denied coverage outright on enumerated grounds.

particular defense (outside of whatever intent is manifest in its communications to the insured regarding its coverage position).  As Latex notes, the relevant inquiry under <u>Hoover II</u> is whether Everest *adequately conveyed to Latex* its intention to rely on a defective notice defense.  730 S.E.2d at 417-18.

Further, as the Court has already noted, Everest did not raise its untimely notice defense until after it filed a motion to dismiss this case (based on non-coverage because of Policy exclusions).  Therefore, even in this litigation (which, as the Court has already discussed, is not the dispositive time period under <u>Hoover II</u>),[6] Everest did not initially rely on this defense.  Everest's purported reservation of all defenses raised by Zurich in its June 2009 letter has

---

[6] Everest places a great deal of emphasis on the <u>Hoover II</u> court's discussion of Maxum's conduct *during litigation* (i.e., beyond its denial letter).  In its reply brief, Everest contends that "<u>Hoover's</u> holding does not focus solely on the content of the denial letter and whether it effectively reserved rights, but rather, the content of the denial letter combined with the insurer's conduct in litigation subsequent to denying coverage."  (Def.'s Reply, [90] at 32 of 48.)  However, the court's discussion of Maxum's conduct during litigation directly follows the court's acknowledgment that Maxum *did* specifically purport to reserve its rights "to raise a litany of other defenses at a later date, including a defense predicated on the insured's failure to provide timely notice of the occurrence."  730 S.E.2d at 418.  Here, neither Everest's reservation of rights letter nor its denial letter even mentioned a notice-based defense.  Plus, as the Court already noted, Everest did not raise this defense at the beginning of this litigation.  Rather, mention of defective notice appears for the first time in Everest's Answer, filed on November 20, 2012, eight months after the Complaint was filed and following its own motion to dismiss the case on other grounds.

33

already been addressed.  (<u>See</u> n. 5, <u>supra</u>.)  None of these facts relied upon by Everest undo the paramount, undisputed fact: it denied coverage outright and simultaneously sought to reserve all future rights with boilerplate language.

Fourth, Everest maintains that <u>Hoover II</u> should not be applied to this case because <u>Hoover</u> dealt with a Georgia insured, a Georgia insurer, a loss in Georgia, and a liability suit pending in Georgia, but the case at bar involves a Georgia insured, a New Jersey-headquartered insurer, a loss in Indiana, and a liability suit pending in Texas.  (Def.'s MSJ Br. [70-25] at 28, 32-33 of 39.)  Everest argues that <u>Hoover II</u> "cannot be credibly argued to stand for the proposition that non-Georgia insurers must comply with Georgia law in denying coverage for losses occurring and lawsuits pending in other jurisdictions."  (<u>Id.</u> at 33 of 39.)  Everest maintains that extension of <u>Hoover II</u> to cases like the present one will force insurers "to issue inconsistent coverage determinations for underlying lawsuits pending in other jurisdictions, one letter if the current state's law applies and a back-up, just in case Georgia law applies."  (<u>Id.</u> at 33-34 of 39.)

While the Court appreciates Everest's public policy concerns, Georgia's public policy is to apply its laws and protections to insureds residing in this

34

state.  Insurance laws and regulations fall within the States' domain.  Everest's contention that insurers, particularly those that do business nationwide, should not be forced to adjust their business and legal practices to comply with different states' laws is a nonstarter.  Furthermore, Hoover II does not require "inconsistent" coverage determinations or denial letters between Georgia and other states – it simply requires clear notice (at least to Georgia insureds) of the insurer's coverage position, whatever that position may be.  The Court also agrees with Latex that nothing in Hoover II's discussion or outcome hinged on where the Parties or underlying losses were located.  Thus, it is proper to apply Georgia law – as articulated in Hoover II – to this matter.

Finally, Everest argues that even if Hoover II controls this case, there are material fact issues regarding waiver of its untimely notice defense, and thus summary judgment is precluded.  (Def.'s Reply, [90] at 39-42 of 48.)  However, none of the salient facts are disputed (e.g., Everest's denial of coverage and simultaneous reservation of all future rights).  Thus, under Hooper II, Everest waived a defense based on untimely notice and any claims based on such a

35

defense fail as a matter of law.[7]

Because the Court has found <u>Hoover II</u> applicable to the present case,

Everest requests that the Court certify three questions to the Georgia Supreme

Court:

(1)   Does <u>Hoover's</u> waiver analysis apply only with regard to losses occurring in and liability suits pending in Georgia (or, for cases in federal court, to which Georgia law applies)?

(2)   Does <u>Hoover's</u> waiver analysis require that, in addition to not specifying the reason for non-coverage in the denial letter, the insurer also take action in the underlying litigation evidencing an intent to waive that defense?

(3)   Does <u>Hoover</u> apply to the duty to indemnify, as well as the duty to defend?

---

[7]   Everest asks the Court to consider that as an excess insurer, it had limited access to information during the Panhandle lawsuit on which to base a coverage position.  (<u>Id.</u> at 39 of 48.)  However, this fact suggests that the prudent thing for Everest to do (given its alleged uncertainty about coverage) would have been to file a declaratory judgment action under a reservation of rights to determine whether coverage existed, not deny coverage outright.  <u>See</u> <u>Hoover II</u>, 730 S.E.2d at 417 (suggesting the "proper and safe course of action" for an insurer when faced with a demand is "to enter upon a defense under a reservation of rights and then proceed to seek a declaratory judgment in its favor").  Furthermore, under the Everest Policy, if Everest even thought the Policy *may* apply to Panhandle's claims, it had the option to associate with Zurich *and control* the Panhandle lawsuit.  It simply opted not to participate.  (<u>See</u> Everest Policy, [70-2] at 24 of 38.)  Regardless, the Court is uncertain how this issue creates a material factual dispute under the <u>Hooper II</u> analysis.

Under O.C.G.A. § 15-2-9, the Court may certify unsettled, determinative

questions of law directly to the Georgia Supreme Court.  However, based on the

Court's interpretation of Hoover II, these questions are not unsettled and they

have been addressed in the Court's discussion above.  Therefore, the Court

declines to certify these questions to the Georgia Supreme Court.

**Conclusion**

Based on the foregoing, Everest's Motion for Summary Judgment [70] is

**DENIED** and Latex's Motion for Partial Summary Judgment [74] is

**GRANTED.**  Everest's first Motion for Summary Judgment [54] was

superceded by its second summary judgment motion [70] and is thus **DENIED**

**as moot.**


**SO ORDERED**, this 31st day of March, 2014.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)